WILLARD T. SEARS *vs.* KINGS COUNTY ELEVATED RAILWAY COMPANY.

Suffolk.   January 18, 1892. — June 20, 1892.

Present: FIELD, C. J., ALLEN, KNOWLTON, MORTON, & LATHROP, JJ.

*Treasurer of Corporation — Action for Services — Foreign Law — Recoupment.*

In an action against a corporation, brought by the plaintiff for services as treasurer, it appeared that the defendant was organized under the laws of New York to build and operate an elevated railroad in Brooklyn.   The capital was fixed at $1,000,000, and $50,000 was paid at the organization to the commissioners of rapid transit, who retained $5,150, and gave a check for the balance, $44,850, to the order of the plaintiff as treasurer.   The statutes of New York were not put in evidence.   Five per cent of the capital stock was required to be paid to the commissioners, and K., S., A., and W. paid this sum, with the understanding with B., one of the promoters, and R., that what was received back should be paid to them.   The directors voted to buy certain patent rights for $994,850.   This sum and the $5,150 made up the $1,000,000.   R. testified that he first gave his check for $994,000 or $995,000 for the stock of the company, and that this was given back to him for the patents, but that afterward, in substitution, he gave a check for $950,000, which was returned to him, and that he drew an order on the treasurer for $44,850, payable to K., being "for balance due me on elevated railway patents," which the plaintiff, as treasurer, paid to K., who distributed it among the contributors.   The check for $950,000, and this order, made up the amount of $994,850, which was agreed to be paid to R. for the patents.   The original agreement was that one third of the capital was to go to S., A., K.,

and W., one third to B. and S., and one third was to be held as treasury stock. The holders besides K., S., A., W., B., R., and the plaintiff, had only small amounts of stock, for which they had paid nothing, and which had been put in their names to make up the number of subscribers required by law. *Held,* that the ruling asked for, that the payment by the plaintiff was a violation of his duty as treasurer, and caused a damage to the company much greater than the amount of his claim against the company, was rightly refused, because it might appear, if the statutes of New York were in evidence, that the payment by the plaintiff was not a violation of his duty under the vote to buy the patents, and because the jury might find that all interested in the stock had authorized or ratified the payment.

CONTRACT, to recover for services as treasurer of the defendant company from January 2, 1879, to May 15, 1881.

At the trial in the Superior Court, before *Thompson,* J., it appeared in evidence that the plaintiff was elected treasurer of the company on its organization, January 2, 1879, and was also one of the directors, and that no salary was established at the time of the election, but that on June 6, 1879, the directors passed a vote fixing a salary. The plaintiff contended, and offered evidence, that this was understood and intended to fix the amount of his salary, and that he accepted the same. The defendant contended, and offered evidence, that the vote was conditional on the carrying out of certain negotiations, which fell through. The votes in regard to salaries were as follows:

" Resolved, That the salary of the president be fixed at the sum of $6,000, to date from the organization of the company, and subject to future adjustment.

" That the salary of the treasurer be fixed at the sum of $6,000, to date from the organization of the company, and to be subject to future adjustment.

" That there be credited to the secretary the sum of $500, for services to the present time."

The defendant company claimed to recoup the amount, if any, due the plaintiff. The corporation was organized under the laws of New York, to build and operate an elevated railroad in Brooklyn, N. Y. No proof of the law of New York was made, and no proof was offered of its provisions, except as hereinafter stated. The capital was fixed at $1,000,000, and $50,000 was paid on the capital at the time of organization, January 2, 1879, to the commissioners of rapid transit. The commissioners retained $5,150 for their services and expenses, and on January 7, 1879,

gave a check for the balance, $44,850, to the plaintiff, payable to his order as treasurer; and the plaintiff on January 14, 1879, deposited the same in the Union Safe Deposit Vaults of Boston, to his credit as treasurer of the defendant. On January 22, 1879, he drew out the same sum, $44,850, by one check to the order of Moses Kimball.

The plaintiff testified that he gave this check pursuant to a vote of the directors of January 15, 1879, upon the order of Roy Stone; that one Simpkins, a banker, paid for him his proportion of five per cent on the capital of $50,000, viz. five per cent on ten or eleven hundred shares that he subscribed for and received; that the money was subsequently repaid to Simpkins out of the $44,850 paid to Kimball, except the proportionate part of the $5,150 retained by the commissioners, and that he acted strictly in pursuance of the votes of the corporation.

The plaintiff testified that the enterprise was brought to his attention by one H. G. Bond. He further testified on cross-examination as follows:

" *Q.* What was the arrangement that you made with Mr. Bond by which you came into it? *A.* The arrangement with Mr. Bond was, that if we went over to New York and subscribed for this stock, for which we had got to pay down five per cent, we were to have the assistance of Mr. Kingsley and some of the other leading parties in Brooklyn, who were in a position to help the matter along through the city government.

" *Q.* What were you to get for it? *A.* Get stock for it.

" *Q.* You said ' we ': whom do you mean by ' we '? *A.* Mr. Bond was one of them; he had his share of the stock.

" *Q.* Who was to furnish the $50,000 ? was Mr. Bond to furnish it? *A.* I was to furnish it, or find parties to furnish it.

" *Q.* Whom did you find to furnish it? *A.* I found Mr. Kimball, Mr. Wooldredge, Mr. Abbot, and Mr. Simpkins, and myself; we furnished the $50,000."

The vote of the directors of January 15, 1879, was as follows:

" Resolved, That this company purchase from Roy Stone the exclusive right to his patents, numbered 162,504, 162,323, and 170,692, for improvements in elevated railways, and other matters, for use in the counties of Kings, Queens, and Suffolk in this State, and Blackwell's Island in the same State, and all connec-

tions between said counties and New York City, upon these terms. Stone is to convey or cause to be conveyed to the company the exclusive rights under said patents to the use of the inventions and improvements thereunder, and all subsequent improvements that he has made or may hereafter make upon said patents, or in connection with the subject matter thereof, for the localities named, and give perfect and absolute title therefor, or cause the same to be given, and the company, upon his doing so, agree to pay him the sum of $994,850."

The order of Roy Stone was as follows: "$44,850. New York, Jan. 18, 1879. For balance due me on Elevated Railway Patents. Pay to the order of Moses Kimball, Esq., forty-four thousand eight hundred and fifty dollars. Value received, and charge the same to the account of Roy Stone. To the Treasurer of Kings County Elevated Railway Company, Boston, Mass."

On the back thereof is the following: "Rec'd payment, Moses Kimball."

Stone testified that he gave his check for $994,000 or $995,000 for the stock of the company, which was given back to him in payment for the patents conveyed by him to the company. Some days after, he gave a new check for $950,000, and also the written order on the treasurer, directing to pay $44,850 to Kimball, and that no money was paid to him in this transaction. Stone further testified on cross-examination:

" *Q.* I don't understand that these negotiations that you had were conducted with Mr. Sears, with the exception of, you say, a committee called on you and asked you whether you would sell your patent for the use of that road at a certain price; and that, as I understand you, is the only time you ever saw Mr. Sears personally? *A.* I can't say that is the only time I ever saw him personally.

" *Q.* It is the only time you ever had any negotiations with him in regard to this business? *A.* I think it is. I don't think of any other interview in which Mr. Sears and I had any business. I met him afterwards in connection with the company's affairs."

Kimball testified as follows:

" *Q.* Was Mr. Sears a party to the original plan to get that stock back? *A.* Yes.

" *Q.* Did you receive from Mr. Stone an order for $44,850? *A.* Received a check for that amount from Mr. Sears.

" *Q.* What consideration did you pay for it? *A.* I paid Mr. Abbot one fourth of it, Mr. Wooldredge one fourth of it, Mr. Simpkins one fourth of it, and I kept one fourth of it for myself, in consideration of money that we advanced to the company.

" *Q.* And that is all you paid? *A.* What, sir?

" *Q.* Then all that you paid was what you paid afterwards from that? Those amounts that you paid these gentlemen whom you name were taken out of that check, were n't they? *A.* Yes, an equal division, four parts.

" *Q.* And that was part of the plan by which you were to secure the amount paid in on the capital stock? *A.* That was returned to the four gentlemen for advancing the $50,000 that was necessary to be first paid.

" *Q.* Where did you get it [the check]? *A.* Mr. Sears handed it to me.

" *Q.* Did you know that he was to hand it to you? *A.* Yes, I knew that we were to have the money back.

" *Q.* Did you know that a larger check was given in the first place? *A.* No.

" *Q.* You did not know anything about that? *A.* No.

" *Q.* You know nothing about the change of checks? *A.* No, I did not know it. I knew that the trade was to be made, and that it was to be arranged in that way. I don't know how it was done; it was done by other gentlemen of the committee.

" *Q.* Now what did you give for that order? what consideration did you pay for it? *A.* I loaned the corporation $50,000.

" *Q.* You loaned it? *A.* Yes. These several gentlemen and myself loaned it. I believe I paid it all in; they handed it to me, and I paid it to the commissioners in Brooklyn.

" *Q.* And that was a loan to the corporation? *A.* That was an advance to the corporation, with the understanding that it was to be returned to us minus the commissioners' charges.

" *Q.* With whom did you have the understanding? *A.* With the gentlemen that were associated with myself in getting hold of this road in Brooklyn, — in getting hold of the franchise, I should have said."

There was no direct evidence, except as here stated, that any of the officers or stockholders of the company except Stone, the plaintiff, and the four who received the $44,850, knew of the agreement by which that sum was to be repaid, or of the repayment, nor was there any evidence that they did not, unless the evidence of Frothingham hereinafter stated is such evidence.   It appeared that the original agreement was, that one third of the capital stock was to be given to Simpkins, Abbot, Kimball, and Wooldredge, and that each of them received his proportionate part of that amount; one third was to be given to Bond and Stone, and one third was to be held as treasury stock.   It also appeared that no money was paid in by the other stockholders, who subscribed for stock to make up the number required by the law.   At the time of the repayment to Kimball, nearly all the stock was held by Kimball, Simpkins, Abbot, Wooldredge, Sears, Bond, and Stone, the other holders having only small amounts, for which they had paid no money, which had been put in their names by these seven, or some of them, to make up the number of subscribers required by law.   Abbot was elected a director in 1881, and continued to be one of the directors; at the time of the bringing of this action he held between three and four thousand shares of the capital; he was and had been chairman of the executive committee, and he testified that he had never brought the matter of the repayment of the $44,850 to himself, Kimball, Wooldredge, and Simpkins to the attention of the directors of the company, and that he knew of no reason why he should do so.   The plaintiff testified that it was not agreed at the start that the services were to be gratuitous, but only that the amount was not to be fixed for the present; but the defendant introduced evidence that " no salaries were to be paid till the company got upon its feet."

After the plaintiff had commenced legal proceedings to collect the amounts claimed for salary, etc., he sent a letter, dated December 19, 1887, to Mr. Jordan, then president of the company, stating that in the suit to recover his salary it would be necessary for him to produce his private account-books, etc., containing " not only payments of doubtful transactions, but correspondence, and records of conversations in connection with the services rendered by you and others in getting confirma-

tions, etc., and for which 'Bond' claimed he furnished money and stock. They will also show that the capital stock was not properly paid; that the five per cent paid at the time of subscription was paid back to 'Abbot' and others who furnished it."

The plaintiff also sent a letter, dated October 22, 1888, to Judge Shea, counsel of the company, stating, " If there had been money in the company's treasury, the salary voted me would have been paid without question during my term of office, and it seems to me that it is very unwise for the company to force me to give its early history to my counsel and to the public through the courts, of the depletion of its treasury by the withdrawal by 'Abbot' and others of their original five per cent subscription to the capital stock of the company, called for under the State laws, and by the payment of a large sum that it was found necessary to disburse through General Jordan. This payment is included in the sum of $81,682.28, charged off on the company's books, without reference to items, they having been audited and approved by a committee appointed by the directors for that purpose, the items and report being in my possession as my vouchers."

Frothingham testified, on cross-examination, that he paid no part of the $50,000 paid to the rapid transit commissioners; that he was aware of the vote of January 15, 1879, hereinbefore set forth, shortly after it was passed; that he supposed at the time, that after that vote, and the transaction with Roy Stone, which was designed to pay up the capital stock and to issue it for patents, the company was without money in its treasury; that he did not suppose that the $950,000 was paid in in money, but that he did not know that Stone had returned to the people who originally subscribed it the balance repaid by the commissioners of the $50,000 paid to them, although he knew that the company had not got it, and did not know of any reason why the company should have it in its treasury after said votes; that the letter aforesaid from the plaintiff to Judge Shea was read to the board of directors of the company, in session, in the presence of the witness, in 1888, and that no resolution had since been passed on the subject by the board of directors, to the knowledge of the witness.

On the question of recoupment, the defendant asked the judge to rule as follows: —

" First.   If the jury finds that the plaintiff, by a prearranged plan with Kimball and others, or with Kimball alone, though through the intervention of the order from Stone, did in effect pay back to Kimball a portion of the identical money which had been paid in at the time of the subscription as a part of the capital stock, according to the requirements of law, then such payment was a violation of the plaintiff's duty as treasurer, and caused a damage to the defendant company much greater than the amount of his claim against the defendant company, and the defendant is therefore entitled to the verdict.

" Second.   Even if the jury should find that the defendant company contracted to pay a salary, as alleged by the plaintiff, he cannot recover in this action, because it appears by the uncontroverted evidence that the defendant suffered from the plaintiff's wrongful payment of the money to Kimball damages far in excess of the amount sued for."

The judge declined so to rule.

The jury returned a verdict for the plaintiff; and the defendant alleged exceptions.

*S. C. Eastman & L. D. Brandeis,* for the defendant.

*L. S. Dabney & H. G. Allen,* for the plaintiff.

FIELD, C. J.   Of the two exceptions taken by the defendant, the first has not been argued.   The second exception relates to two rulings asked upon the question of recoupment.   Of these requests the second ought not to have been given, because it does not in fact appear " by the uncontroverted evidence that the defendant suffered from the plaintiff's wrongful payment of the money to Kimball damages far in excess of the amount sued for," as stated in the request.   The exceptions recite that the defendant was a corporation " organized under the laws of New York to build and operate an elevated railroad in Brooklyn, N. Y.   No proof of the law of New York was made, and no proof was offered of its provisions, except as hereinafter stated. The capital was fixed at $1,000,000, and $50,000 was paid on the capital at the time of organization, Jan. 2, 1879, to the commissioners of rapid transit.   The commissioners retained $5,150 for their services and expenses, and on Jan. 7, 1879,

gave a check for the balance, $44,850, to the plaintiff, payable to his order as treasurer," etc.   The statutes of New York were not put in evidence, and we cannot take judicial notice of them. It seems that five per cent. of the capital stock was required to be paid to the commissioners of rapid transit, and that four persons, Kimball, Simpkins, Abbot, and Wooldredge, paid this sum of money to the commissioners under an agreement, as we infer, with Bond and Stone, that what was received back from the commissioners should be repaid to them.   The directors, on January 15, 1879, voted to buy of Roy Stone certain rights in certain patents, and to pay him the sum of $994,850.   This sum and the $5,150 retained by the commissioners make up the sum of $1,000,000.   Stone testified that he first gave his check for $994,000 or $995,000 for the stock of the company, and that this check was given back to him in payment for the patents, but that afterward, in substitution for this transaction, he gave a check for $950,000, which we infer was returned to him, and that he drew an order on the treasurer for $44,850, payable to Moses Kimball, being " for balance due me on elevated railway patents," which the plaintiff, as treasurer, paid to Kimball, and he distributed among the four persons who contributed the $50,000.   The check for $950,000 and this order together make up the amount of $994,850, which was agreed to be paid to Stone for the patents.   The defendant complains that the treasurer violated his duty in making this payment.   But according to the terms of the vote the money was due to Stone for the patents.   The exceptions recite : " It appeared that the original agreement was that one third of the capital stock was to be given to Simpkins, Abbot, Kimball, and Wooldredge, and that each of them received his proportionate part of that amount; one third was to be given to Bond and Stone, and one third was to be held as treasury stock."   We infer that Stone was regarded as a subscriber for 9,500 shares of the stock, which was considered as paid for by his check, which was handed back to him in part payment of the patents ; Kimball, Abbot, Simpkins, and Wooldredge had paid $50,000, but through the order of Stone had received back $44,850, and they perhaps regarded the difference, namely, $5,150, as a contribution towards the capital stock.   Apparently, no other subscriber to stock paid anything,

"the holders" besides Kimball, Simpkins, Abbot, Wooldredge, Sears, Bond, and Stone "having only small amounts for which they had paid no money, which had been put in their names by these seven, or some of them, to make up the number of subscribers required by law." A transaction of this character ought to be forbidden by law, but, as the law of New York regulating the organization of elevated railway companies must be statutory, we do not know what the law was, or whether the transaction was in violation of that law. There was evidence from which the jury might find that the seven persons named above intended that this $44,150 should be paid to Stone in part payment of his patents. The other holders of stock might perhaps be considered as holding the stock, not for themselves, but for the persons who put it in their names. Upon this statement of the evidence, it is clear that the first of the rulings asked for on the question of recoupment ought not to have been given, because, if we knew the statutes of the State of New York, it might appear that the payment of $44,850 was not "a violation of the plaintiff's duty as treasurer," under the vote of the corporation to buy of Stone the patents; and because the jury might find that all the persons having any beneficial interest in the stock of the corporation had authorized or ratified the payment. No exceptions were taken to the charge of the presiding justice.                    *Exceptions overruled.*